## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

COREY BRIGHT,

      Petitioner,

v.                                              Case No. 3:20-cv-1133-TJC-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## **ORDER**

### I.   **Status**

Petitioner Corey Bright, an inmate of the Florida penal system, initiated this action by filing a pro se Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. See Doc. 1. He is proceeding on an Amended Petition. See Doc. 4. Petitioner challenges a state court (Duval County, Florida) judgment and conviction for aggravated assault with a deadly weapon and possession of a firearm by a convicted felon. Petitioner is serving a cumulative twenty-three-year term of incarceration. Respondents responded. See Doc. 11 (Resp.).[1] The Court gave Petitioner until April 25, 2022, to either file a reply or a notice that

_____

[1] Attached to the Response are various exhibits. The Court refers to the exhibits as "Resp. Ex."

he did not intend to file a reply. <u>See</u> Doc. 13. Petitioner did not file a notice or reply by the deadline. Instead on October 16, 2023, Petitioner moved to amend his Amended Petition, which is still pending before the Court and addressed herein. <u>See</u> Doc. 15. Thus, this case is ripe for review.[2]

## II.   <u>Governing Legal Principles</u>

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert.</u> <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1),

3

(2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." <u>Id.</u> § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> [at 102] (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. <u>See, e.g.</u>, <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18 (2003); <u>Lockyer</u>, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

<u>Bishop v. Warden, GDCP</u>, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. <u>See</u> 28 U.S.C. §

2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]"

every issue raised in his federal petition to the state's highest court, either on

direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351

(1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners

must give the state courts one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate

review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope

v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the

state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28
> U.S.C. § 2254(b)(1), thereby giving the State the
> ""opportunity to pass upon and correct" alleged
> violations of its prisoners' federal rights.'" Duncan v.
> Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d
> 865 (1995) (per curiam) (quoting Picard v. Connor, 404
> U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To
> provide the State with the necessary "opportunity," the
> prisoner must "fairly present" his claim in each
> appropriate state court (including a state supreme
> court with powers of discretionary review), thereby
> alerting that court to the federal nature of the claim.
> Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan
> v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

5

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[3] supra, at 747–748, 111 S. Ct. 2546; Sykes,[4] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

---

[3] Coleman v. Thompson, 501 U.S. 722 (1991).

[4] Wainwright v. Sykes, 433 U.S. 72 (1977).

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Even though a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

Without a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a

---

[5] Murray v. Carrier, 477 U.S. 478 (1986).

> constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v.</u>

<u>Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

The two-part <u>Strickland</u> test applies to challenges to the validity of guilty pleas based on ineffective assistance of counsel. <u>Hill v. Lockhart</u>, 474 U.S. 52, 58 (1985). The petitioner must still show that counsel's performance was deficient. <u>See</u> <u>id.</u> at 56-59; <u>Lynch v. Sec'y Fla. Dept. of Corr.</u>, 776 F.3d 1209, 1218 (11th Cir. 2015). To establish prejudice, however, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill</u>, 474 U.S. at 59 (footnote omitted); <u>Lynch</u>, 776 F.3d at 1218.

There is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in

<u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.   Factual and Procedural History

The facts of the case are taken from Petitioner's initial brief filed on direct appeal. Resp. Ex. H.

> The State called Shirae Bryant. The decedent was her boyfriend and the father of her child. They lived as a family in Moncrief Village on July 24, 2012, the date of the shooting. She confirmed that the decedent domestically abused her. Due to an "altercation" over the weekend, the landlord requested that the family leave the apartment complex.
>
> Ms. Bryant called her cousin, Cereissa Webb, and informed her of her situation. While discussing the situation, Ms. Webb told Ms. Bryant that her brother and Ms. Bryant's cousin, Richard Person, needed to come speak with the couple. Later that afternoon, Richard Person came to her apartment. He asked how Ms. Bryant was doing and inquired about the decedent, but he was not home. At that time, Mr. Person was with a tall, heavy-set, bald, light-skinned, black male, later to be known as Miles McChriston.
>
> Later that same evening Mr. Person called Ms. Bryant, but she did not answer. She then heard a person knocking on her door, which grew louder. When she answered the door, "Miles and Corey" were present. One of the guys that came to the door asked if she was okay, and told her that Mr. Person wanted to speak with her. Though Mr. Person drives a vehicle, he has an amputated leg and remained in the car.
>
> When she arrived at the car, Mr. Person asked whether the decedent was in the apartment; to which Ms. Bryant responded "yeah." The two cousins then had a normal conversation. The decedent then walked over from the apartment to where Mr. Person and Ms. Bryant were speaking. Upon seeing the decedent Mr.

11

Person "flipped" and asked "why you put your hands on my cousin?" The decedent stated it was just an altercation; nothing major. He was not threatening to Mr. Person in any manner and was not armed with a weapon.

Three men accompanied Mr. Person. Ms. Bryant did not see any weapons on the four men. Mr. Person asked the decedent again why he put his hands on Ms. Bryant and the decedent again said it was merely an altercation. The decedent then turned to walk away; Mr. Person told Ms. Bryant to move. Mr. Person reached under the seat, grabbed a gun, and "everybody started shooting." Ms. Bryant observed the gun in Mr. Person's hand. The other three men did not "go for a gun" and Ms. Bryant believed the guns to be on their persons. The decedent turned, screamed, and eventually fell to the ground. The four men then jumped into the car and drove away.

Ultimately, Ms. Bryant spoke to law enforcement and identified the additional three suspects via photospread as "Miles[,"] another as "Ms. Webb's boyfriend[,"] and Mr. Bright as "one of the guys standing with Richard at the time of the shooting" who also "tried to talk to me." She testified that Mr. Bright fired his gun that evening. Ms. Bryant further testified that when the decedent walked away he appeared to be going straight and not towards their apartment. She explained that all of the shootings occurred at once; no long break occurred.

On cross-examination Ms. Bryant stated that Mr. Person did not seem mad when she spoke to him earlier in the day. She confirmed that Mr. Bright was the one that spoke with her when she opened the door and was "flirting" with her. She further confirmed that Mr. Bright did not appear mad or angry. Ms. Bryant verified that it was only Mr. Person and the decedent who were in a "heated conversation."

12

Ms. Bryant explained that when Mr. Person told her to move out of the way she observed the gun in his hand and focused on his firearm. She observed flames come from the front of the gun. She was in shock. She focused on Mr. Person shooting. She heard other shots, but could not testify who shot when. She confirmed that some of the fired bullets went way past the decedent and did not hit him. On re-direct Ms. Bryant confirmed that she was not present in the car ride over to her apartment or from her apartment after the shooting.

James Lawson Williams, IV, also known as "BJ" or "Bossman[,"] an inmate at the Duval County Jail, testified next. For his part in the decedent's death Mr. Williams pled to a reduced charge of second degree murder. He testified he was facing 20 years to life imprisonment. Mr. Williams knew Mr. Person as he dated Person's sister[,] Ms. Webb. He knew Miles McChriston and Mr. Bright, whom he identified in open court, through Person as well. Mr. Williams testified that McChriston, Person, and Mr. Bright were all participants in the decedent's murder.

On July 24, 2012, Mr. Williams was at Person's apartment when Ms. Webb received a phone call from Ms. Bryant. Person got on the phone, spoke with Ms. Bryant, and then left with Miles McChriston. Person and McChriston later returned to the apartment with Mr. Bright and "Maurice[."] Neither Mr. Bright nor Maurice were present earlier at the apartment.

Later in the evening the five men left Person's apartment to take Maurice home; Williams was the last man to enter the car. Person was driving, McChriston was in the passenger seat, Mr. Bright in [the] rear driver's seat, Maurice in the middle, and Mr. Williams in the rear passenger seat. After dropping Maurice off at his home, the four men proceeded to Moncrief Village. Upon arrival, Mr. Bright and McChriston exited the vehicle and knocked on Ms. Bryant's door.

13

No words were spoken between the men before exiting. Ms. Bryant exited her apartment and walked over to speak with Person. The other two men stood for a while longer near her apartment; ultimately returning to the car.

Moments later the decedent exited the apartment and approached Person; the two exchanged words. Standing near the car Mr. Bright and McChriston had their guns in hand at their side; Bright carrying a 9mm and McChriston carrying a .45. According to Mr. Williams, both men originally exited the car with their weapons when they approached the apartment.

Williams testified that the decedent did not threaten any of the four men and did not display a weapon. After the exchange with Person the decedent began to walk off between the two apartment buildings with his back toward the men. When the decedent walked away, Person retrieved his gun, yelled "what did [you] say[,"] told Ms. Bryant to move, and fired his gun. Williams saw the shot Person took strike the decedent. The decedent made a sound and spun in a circle towards the men. McChriston then fired his gun and the decedent fell to the ground. Mr. Williams then let off a round and Mr. Bright did as well. The decedent was already on the ground when both Williams and Bright shot their guns. Williams described it as a "heat of the moment type of thing."

After the shooting, the men got in the car and drove back to Person's apartment complex. Mr. Williams told the men they were going to jail. He explained that he believed the entire situation [was] "stupid" and further expressed if they were going to kill him they should have killed her too as she was going to notify the authorities.

Upon returning to Person's apartment[], McChriston checked the car and retrieved a shell casing from

Person's gun in the windshield area. He threw it in a retention pond. Mr. Williams put his gun in a red bag at the apartment and that was the last he saw of it.

On cross-examination Mr. Williams confirmed there was no conversation on the way to Moncrief Village about killing the decedent; stating he believed they were merely dropping Maurice home. Williams was in shock when the shooting began; but remembered that Person shot first – only once; then McChriston – several times with a .45, the decedent fell to the ground; there was a split second pause, and then Williams fired his gun – only once in order to provide the men time to get back in the car and avoid fire from other potentials in the high-crime apartment complex; and then Mr. Bright fired one time.

Mr. Bright did not walk up and shoot the decedent. Much like Mr. Williams, Mr. Bright fired a round, not aiming at the decedent, attempting to get out of the area.

On re-direct Mr. Williams confirmed that there was a time that day when Person, McChriston, and Bright were together when he was not present. He had no idea what the men may or may not have discussed at that time. Williams confirmed that McChriston and Mr. Bright got out of the car with their guns when they reached Moncrief Village without any discussion.

Ms. Cereissa Webb testified. She confirmed her relationships and knowledge of the four men and Ms. Bryant. She confirmed receiving a call from Ms. Bryant regarding having troubles with her boyfriend. She further confirmed that the four men later left Person's apartment with Maurice. They did not return until the morning of July 25, 2012.

Officer Derek Gianakas of the Jacksonville Sheriff's Office also testified. He reported to the scene and

15

observed a person lying on the sidewalk. He canvassed the area, found five bullets, and a stray bullet that entered Apartment 4651.

Captain Christopher Woods, a paramedic with the Jacksonville Fire/Rescue Department also responded to the scene . . . . Fire/rescue attempted to resuscitate the decedent on scene and during transport to UF Health, to no avail.

Detective Dziergoswki, an evidence technician with Jacksonville Sheriff's Office also testified. He served as the lead crime scene technician, while Detective Kolbyarz was also present. Detective Dziergoswki took pictures on scene and collected five shell casings from the area. He identified State's Exhibit ("SE") 52, 54, and 51 as .45 casings and SE 55 as a 9mm casing. He identified SE 58 as a projectile from within Apartment 4651.

Dr. Valerie Rao, the medical examiner for the Fourth Circuit, performed the autopsy of the decedent, Antonio Mosley. Dr. Rao testified that no gunshot wounds entered the front of the decedent's body. All gunshot wounds entered from the back, and one grazed the right buttock. She identified four entry wounds, A, B, C, and D. She identified B as the fatal wound, but testified that all of the wounds contributed to his death. She collected projectiles from wounds A and B.

. . . .

Jacksonville Sheriff's Office Homicide Detective Dennis Sullivan also testified. He was the lead detective in this case. Detective Sullivan reported to the Police Memorial Building to interview Ms. Bryant. From this interview he learned of Mr. Person and Ms. Webb, whom he later interviewed. From these interviews he gained the names of the other males present when Mr. Mosley was killed – McChriston, Bright, and Williams.

He later interviewed Williams who admitted to being present and firing a .380. Person provided the .380 firearm to detectives previously; however, no .45 or 9mm weapons were ever recovered.

Detective Sullivan obtained an arrest warrant for Mr. Bright, whom was arrested on November 28, 2012. The detective identified Mr. Bright in open court. He interviewed Mr. Bright upon his arrest and this interview was audio and video recorded. At the inception of the interview, Mr. Bright admitted to being present when Mr. Mosley was shot, but denied possessing or discharging a firearm. Ultimately, Mr. Bright admitted he shot a round in the direction of the decedent but toward a building "so he wouldn't be the target of the codefendants."

Mr. Bright explained on the way to Moncrief Village Person said that he wanted to talk to Ms. Bryant and the decedent; "he didn't say he was going to do none of that." He admitted to flirting with Ms. Bryant on the night in question. He ultimately admitted to possessing a 9mm and discharging it one time. He explained he fired after Mr. Mosley fell "basically to the ground" at the wall of an apartment building. He believed he might have hit the wall. When asked why he shot a round, Mr. Bright explained he had no reason, that the situation had nothing to do with him, and he basically just began to shoot in the air.

On cross-examination, Detective Sullivan explained: Mr. Bright "wanted to go along because [the codefendants] were armed, and I don't think he wanted to subject himself to either their scrutiny or possibly become a target for not going along." The detective confirmed that a 9mm bullet neither killed nor struck Mr. Mosley. He further verified that a bullet was in fact found in the wall of an apartment, but testified the type of projectile was unknown.

17

The State then rested its case. The defense moved for a judgment of acquittal as to the charge of first degree murder. The State argued that it had proven a prima facie case against Mr. Bright based upon his interview and the testimony of trial witnesses. The trial court asked "[u]nder the principal theory?" The State responded that it had proven its case based upon not only [the] principal theory, but also noted that the defendant shot with the intent to kill.

The trial judge explained that the only evidence it heard from the medical examiner was that the fatal shot came from a .45[.] The State conceded it was moving forward on the charge of first degree murder based upon [the] "principal theory[.]" Defense counsel argued that the evidence was insufficient to move forward even on [the] principal theory as the only evidence introduced was that "they got in the car and they went over there." Mr. Bright and McChriston walked up to the apartment to get Ms. Bryant because her cousin, Person, wanted to speak with her, but could not walk up on his own due to his amputation. They then return[ed] to the car. Defense counsel argued that there was no evidence that Mr. Bright (or anyone else) forced or enticed Mr. Mosley to exit the apartment. Defense counsel explained that the State failed to prove that a common plan existed; reiterating that Mr. Mosley, after exiting the shower, came out to the car, exchanged words with only Mr. Person, and Mr. Person then fired his gun at the decedent.

The trial court explained that the following inferences could be drawn from the State's case: all four men understand that the decedent is allegedly abusing Ms. Bryant, they all go over to Moncrief Village armed to intervene in some capacity, they all exit the vehicle armed, that Mr. Bright exited the vehicle in order to speak to Ms. Bryant. Though the trial court struggled with an act of contribution toward the furtherance of the charged crime by Mr. Bright, the State argued:

18

that [Mr. Bright] firing the gun at the
second the victim's dropping down, not
knowing if the victim's been fatally
wounded, victim's still alive, that is a
contributing action. He's just a member of
this four-person team that knows exactly
what they're going to do when they park
the car. They all get out. They're all acting
with a plan. They're all acting under the
operation to commit this murder. He's
firing in furtherance of that.

Ultimately, the trial court denied the motion for
judgment of acquittal stating "I agree and I'll support
you in the inference with respect to the assist because
by firing a weapon, it's a potential assist in helping
them exit the scene. It shows that he's part of the
common plan."

The Defense then rested its case.

. . . .

During a break from testimony, the trial court
conducted the charg[e] conference. The State prepared
the jury instructions, which included several
permissive lesser included offenses, one of which was
aggravated assault. Defense counsel advised the trial
court he had "no objection" to this lesser included
offense instruction.

The jury returned a verdict of guilty to the lesser
included offense of aggravated assault, specifically
finding that Mr. Bright actually possessed and
discharged a firearm. Mr. Bright entered a negotiated
plea of guilty to Count II – possession of a firearm by a
convicted felon. The sentence agreed upon was a
minimum-mandatory sentence of three years to run
consecutively to Count I aggravated assault. As to
Count I – the trial court adjudicated Mr. Bright guilty

and sentenced him to the mandatory minimum of 20 years.

Resp. Ex. H (record citations omitted).

## IV.   **The Amended Petition**

### a. Ground One

Petitioner alleges his trial counsel was ineffective for waiving Petitioner's presence at pretrial status hearings and failing to properly prepare his case for trial. Doc. 4 at 5. Petitioner asserts that after his December 3, 2012, appointment as trial counsel, Charles Fletcher waived Petitioner's appearance at over fifteen pretrial hearings without Petitioner's permission. Id. at 5. According to Petitioner, in October 2013, Petitioner filed a pro se motion for a Nelson[6] hearing due to Mr. Fletcher's failure to investigate his case and prepare a proper defense, but the pro se motion was never addressed because trial counsel prevented Petitioner's appearance at pretrial hearings. Id. Petitioner also seems to argue that the trial court erred in failing to ask about Petitioner's pro se motion requesting a Nelson hearing. Id.

Respondents argue that Petitioner's ineffective assistance of trial counsel claim is unexhausted because he did not present the issue to the state court. Resp. at 20. They assert that during his direct appeal, Petitioner raised a claim that the trial court erred in failing to conduct a Nelson inquiry; but in raising

---

[6] Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973).

20

that issue, Petitioner did not allege or suggest that his trial counsel was ineffective for failing to ensure his presence at all his pretrial hearings or for failing to investigate and prepare a proper defense. <u>Id.</u> They also contend Petitioner did not later raise the ineffective assistance of trial counsel claim in any postconviction motion filed with the state court. <u>Id.</u> Respondents do not address the trial court error claim raised in Ground One.

### i. *Ineffective Assistance of Trial Counsel*

The Court agrees that Petitioner did not exhaust the ineffective assistance of trial counsel claim in Ground One. On direct appeal, Petitioner raised a claim that the trial court committed reversible error in failing to conduct a preliminary <u>Nelson</u> inquiry after Petitioner filed a pro se motion requesting a <u>Nelson</u> hearing. Resp. Ex. H. While Petitioner mentioned "someone" waiving his appearance at pretrial hearings and that the motion asking for a <u>Nelson</u> hearing turned on trial counsel's failure to investigate his case, prepare a proper defense, and file pretrial motions, Petitioner's claim on direct appeal was one of trial court error and not one of ineffective assistance of counsel.[7] <u>See</u> Resp. Ex. H. To highlight this point, when addressing this issue in its answer brief filed on direct appeal, the state considered the claim to be

---

[7] As a separate claim raised on direct appeal, Petitioner did allege a claim of ineffective assistance of trial counsel regarding trial counsel's alleged failure to object to the jury instructions. Resp. Ex. H. The Court addresses that claim in Ground Three.

one of trial court error about the trial court's alleged failure to conduct a <u>Nelson</u> inquiry in response to Petitioner's pro se motion. Resp. Ex. I. As such, this ineffective assistance of trial counsel claim is unexhausted and procedurally barred. Petitioner fails to either show cause or prejudice from the default and he has not shown a fundamental miscarriage of justice will result if the claim is not addressed on the merits. Thus, this portion of Ground One is denied.

  *ii.* *Trial Court Error*

  To the extent that Petitioner claims the trial court failed to conduct a <u>Nelson</u> hearing in response to his pro se motion, that claim is an issue of state law and not cognizable on federal habeas review. In <u>Nelson</u>, Florida's Fourth District Court of Appeal held that if an indigent defendant expresses a desire to discharge court-appointed counsel because of counsel's ineffectiveness, the trial court must hold a hearing to determine whether there is reasonable cause to believe that the court-appointed counsel is not rendering effective assistance to the defendant. <u>Nelson</u>, 274 So. 2d at 256; <u>see also</u> <u>Glover v. State</u>, 226 So. 3d 795, 807 (Fla. 2017) (discussing <u>Nelson</u> hearings); <u>Hardwick v. State</u>, 521 So. 2d 1071, 1074-75 (Fla. 1988) (approving and adopting <u>Nelson</u> hearings). If the trial court finds that counsel is acting ineffectively, the trial judge will appoint substitute counsel. <u>Nelson</u>, 274 So. 2d at 256.

The United States Supreme Court has not established a procedure for when a represented indigent criminal defendant does not want to proceed pro se, but instead wants another court-appointed lawyer because his current lawyer is allegedly ineffective. See, e.g., United States v. Garey, 540 F.3d 1253, 1262-66 (11th Cir. 2008) ("Although the Sixth Amendment guarantees counsel, it does not grant defendants the unqualified right to counsel of their choice. An indigent criminal defendant 'does not have a right to have a particular lawyer represent him, nor to demand a different appointed lawyer except for good cause.'" (quoting Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985)). This Court will not reexamine state court determinations on issues of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Since Petitioner's claim regarding a Nelson inquiry presents a state-law claim related to the trial court's failure to follow the procedures of a state law requirement, Petitioner has no right to federal habeas relief on that claim, as there has been no breach of a federal constitutional mandate. Ortiz v. McNeil, No. 3:09-cv-563-HWM-TEM, 2010 WL 4983599, at *5 (M.D. Fla. Dec. 2, 2010) ("Any complaint about the lack of a proper Nelson inquiry raises an issue of state law that is not cognizable in this proceeding."). Thus, Ground One is due to be denied.

**b. Ground Two**

Petitioner argues that the trial court erred in denying his motion for judgment of acquittal on the first degree murder charge because the state did not present enough evidence that Petitioner committed the offense as a principal. Doc. 4 at 7. According to Petitioner, his conviction for aggravated assault must be vacated. Id. at 8.

After the state rested its case, Petitioner moved for a judgment of acquittal. The trial court's consideration of the motion is summarized in Petitioner's initial brief filed on direct appeal:

> The trial court explained that the following inferences could be drawn from the State's case: all four men understand that the decedent is allegedly abusing Ms. Bryant, they all go over to Moncrief Village armed to intervene in some capacity, they all exit the vehicle armed, that Mr. Bright exited the vehicle in order to speak to Ms. Bryant. Though the trial court struggled with an act of contribution toward the furtherance of the charged crime by Mr. Bright, the State argued:
>
>> that [Mr. Bright] firing the gun at the second the victim's dropping down, not knowing if the victim's been fatally wounded, victim's still alive, that is a contributing action. He's just a member of this four-person team that knows exactly what they're going to do when they park the car. They all get out. They're all acting with a plan. They're all acting under the operation to commit this murder. He's firing in furtherance of that.

> Ultimately, the trial court denied the motion for judgment of acquittal stating "I agree and I'll support you in the inference with respect to the assist because by firing a weapon, it's a potential assist in helping them exit the scene. It shows that he's part of the common plan."

Resp. Ex. H at 16-18 (record citations omitted).

Following the jury's verdict, Petitioner, with help from counsel, argued on direct appeal that the trial court erred in denying his motion for judgment of acquittal. Resp. Ex. H at 22-33. In its answer brief, the state argued the following in pertinent part:

> As the State presented both direct and circumstantial evidence in the case at bar, the special standard [applicable to circumstantial evidence cases] is not applicable and the State was not obligated to exclude the defendant's reasonable hypothesis of innocence.

> In the case at bar, the victim's girlfriend, Ms. Bryant, testified that her cousin stopped by her home and asked to speak to the victim but he was not home at that time. During that brief visit she informed her cousin that there were not any additional issues between her and the victim as they were no longer going to be living together. Later that same day, after the victim came home, Ms. Bryant's cousin called her phone but she ignored it and then someone started knocking on her door. Initially, Ms. Bryant ignored the knocking but finally chose to answer the door as "they started bamming [sic] on the door." The men at the door asked if she was alright and informed her that her cousin wanted to speak to her.

> While Ms. Bryant was speaking with her cousin outside and informing him things were fine between her and

25

the victim, the victim joined them. The victim did not have a weapon on him nor did he threaten Ms. Bryant's cousin. The victim insisted he and Ms. Bryant were fine and then began to walk away. As he walked away, Ms. Bryant's cousin told her to move and then he "reached under the seat and grabbed a gun and everybody just star[t]ed shooting."

After the victim was hit, he turned and started screaming but the men kept shooting. Afterward, the men "[j]umped in the car and drove off." Ms. Bryant later informed police of her cousin's involvement and identified the other three men involved from a photo lineup. Ms. Bryant distinctly recalled Appellant as one of the men who retrieved her from her apartment before the shooting as he was "trying to flirt with [her]." Ms. Bryant also testified Appellant fired his gun during the shooting.

Immediately after the victim turned away, Ms. Bryant's cousin initiated the shooting, and the others fired instantly after him, the shots occurred quickly and "[i]t just -- all of it happened at once." Though Ms. Bryant identified Appellant as one of the shooters, it all happened so quickly she did not note the order of how they fired their weapons.

One of the codefendants, Mr. Williams, testified against Appellant. Prior to the shooting, there was a time period where the other defendants, including Appellant, were together without Mr. Williams and he was unaware of the topics they may have discussed. That afternoon, Mr. Williams believed the group was leaving his girlfriend's apartment solely to drop off another gentleman, but after doing so, the vehicle turned into a different apartment complex. Immediately upon arrival, Appellant and another man got out of the vehicle while armed and knocked on Ms. Bryant's door. Mr. Williams noted Appellant did not

need to be told what to do, he simply took action upon their arrival.

When Ms. Bryant did not immediately answer the door, the men persisted until she did. While Ms. Bryant spoke with her cousin, Appellant stood by with his gun already in his hand. Though the victim was retreating and was not a threat to the group, Ms. Bryant's cousin still shot him. After the victim was already on the ground, Mr. Williams and Appellant finally fired shots, in "the heat of the moment type of thing."

Det. Sullivan testified Appellant was apprehended November 28, 2012 and was subsequently interviewed. The interview was recorded in its entirety. Prior to asking questions, the detectives went over Appellant's constitutional rights and ensured he understood them. Appellant indicated he understood his rights and was willing to speak with the detectives. Though Appellant initially denied any involvement in the actual shooting, he later admitted he had fired his weapon but insisted he did not hit the victim. Appellant was ultimately charged with first degree murder and possession of a firearm by a convicted felon. During trial, the taped admission was played for the jury to hear. The jury ultimately found Appellant guilty of aggravated assault with the finding that he "actually possessed and discharged a firearm during commission of the offense."

Though Appellant insists there was insufficient evidence to establish a prima facie case of guilt for first degree murder, the record clearly demonstrates otherwise. The State presented two eye witnesses who confirmed Appellant's recorded admission that he did indeed fire his weapon at the scene. Additionally, one of the codefendants testified that he had not been privy to earlier conversations in the day and that upon arrival at the victim's apartment complex, Appellant exited the vehicle armed and knew to knock on Ms.

Bryant's door until she answered; behaving in a manner that suggested a pre-determined plan. Thus, there was sufficient evidence for the first degree murder charge to be a question for the jury.

Appellant relies upon C.P.P. v. State, 479 So. 2d 858, to insist the State failed to prove a prima facie case. Yet, in C.P.P., the State heavily relied upon the defendant's mere presence and flight from the scene of the offense. Id. at 859. Whereas in the case at bar, it has already been established the State did not solely rely upon circumstantial evidence. Moreover, direct eye-witness testimony and Appellant's taped interview proved he actively participated in the crime. Additionally, evidence suggested Appellant was privy to a pre-determined plan involving the victim. Thus, the State clearly established a prima facie case of guilt for first degree murder and the issue of guilt was a matter for the jury to determine.

Ultimately, Appellant's actions upon arrival at the victim's apartment complex suggested a pre-arranged plan with some of the other defendants that resulted in the death of the victim. Thus, as there was sufficient evidence to support the question going before the jury, this Court must affirm.

Resp. Ex. I at 8-12 (record citations omitted). The First DCA per curiam affirmed Petitioner's judgment and convictions without a written opinion. Resp. Ex. K.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. When reviewing an insufficiency of the evidence claim in a habeas petition, a federal court must determine "whether, after viewing the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). The court must assume that the jury resolved any evidentiary conflicts in favor of the prosecution, and the court must defer to that resolution. <u>Id.</u> Here, the evidence supported the trial court's denial of Petitioner's motion for judgment of acquittal as to the first degree murder charge. Eyewitness testimony about Petitioner's conduct and actions suggested a predetermined plan to confront the victim such that it was reasonable for the trial court to allow the first degree murder charge to go to the jury.

Thus, upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. Ground Two is denied.

### c. Ground Three

Petitioner alleges that his trial counsel was ineffective for failing to object to the inclusion of the jury instruction for the permissive lesser included offense of aggravated assault. Doc. 4 at 9-10.

Petitioner raised this claim in his Florida Rule of Criminal Procedure

3.850 motion filed in state court.[8] Resp. Ex. N at 2. After conducting an

evidentiary hearing on the issue, the trial court denied the claim as follows:

> Defendant alleges counsel was ineffective for failing to object to the permissive lesser included offense of aggravated assault. Defendant suggests a defendant cannot be convicted of a lesser included offense where the charging document does not charge one of the essential elements of that lesser-included offense. Defendant maintains his charging document did not charge the essential element of fear required for an aggravated assault conviction. In support of his claim, Defendant cites <u>Woodall v. State</u>, 94 So. 3d 666, 669 (Fla. 5th DCA 2012).
>
> On March 5, 2018, this Court ordered the State to respond to this Ground. On September 27, 2017, this Court issued a Second Order directing the State to respond. The State filed its Response on April 18, 2018, conceding the need for an evidentiary hearing, and on July 25, 2018, this Court granted such a hearing. The evidentiary hearing was held on October 10, 2018. Defendant [ ] was present throughout the hearing and appeared pro se. Assistant State Attorney London Kite represented the State.
>
> . . . .
>
> "[W]hen an offense is not a necessarily lesser-included offense of the charged offense that is, the offense is a 'category 2' or permissive lesser-included offense – the trial court cannot convict the defendant of the lesser

---

[8] Petitioner also raised this claim on direct appeal. Resp. Ex. H at 38. In its answer brief, the state argued that the claim was not preserved for appellate review, and as an alternative argument, it asserted the claim lacked merit. Resp. Ex. I at 17-18. The First DCA per curiam affirmed Petitioner's judgment and sentence without a written opinion. Because it is unclear if the state appellate court considered the claim on the merits, the Court discusses the claim by considering it in context of Petitioner's Rule 3.850 proceedings.

crime unless the allegations of the charging document include the elements of that crime." <u>A.D. v. State</u>, 15 So. 3d 831, 833 (Fla. 2d DCA 2009); <u>Woodall</u>, 94 So. 3d at 669. In this case, Defendant's charging Indictment does not include an allegation regarding the element of fear required for an aggravated assault conviction. Defense counsel, however, did not object to the inclusion of the lesser-included offense of aggravated assault.

At the evidentiary hearing, the State presented the testimony of trial counsel. Counsel indicated there was not much defense to the charges considering Defendant's own statements to police admitting he was not only at the scene of the crime, but also possessed and discharged a firearm as well as the testimony of one of his co-defendants that would mimic Defendant's statements. Therefore, trial counsel explained that he strategically chose to request all the lesser included offenses he could, despite the State's objection, because he was trying to get the jury to return a verdict of anything less than First Degree Murder, as charged. Counsel stated he would have went over all the lesser included offenses with Defendant and remembers talking to Defendant about the various arguments that could be made. If convicted of First Degree Murder, Defendant was facing a minimum mandatory sentence of life and instead, the jury was able to return a verdict for aggravated assault for which Defendant only received a twenty-year minimum mandatory.

Counsel's testimony reveals that counsel considered alternative options and made a strategic choice to include instructions on these lesser included offenses. This Court finds that this decision was reasonable considering the evidence against Defendant. Accordingly, this Court finds counsel did not act deficiently in requesting the instructions on the lesser included offenses and Defendant is not entitled to relief.

31

Resp. Ex. N at 138-42 (record citation omitted). Petitioner appealed the trial court's denial, and the First DCA per curiam affirmed the ruling without a written opinion. Resp. Ex. Q.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Whether an attorney's actions derived from a strategic decision is an issue of fact, and the state court's decision on that issue is presumptively correct. Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998); see also Chandler v. United States, 218 F.3d 1305, 1314, n.14 (11th Cir. 2000) ("[A] court must not second-guess counsel's strategy."). Having chosen a reasonable defense strategy, Petitioner's counsel was not ineffective for requesting the inclusion of the permissive lesser included offense of aggravated assault. Petitioner was facing a charge of first degree murder that carried a mandatory life sentence. Trial counsel testified that the evidence showed Petitioner was present during the murder and participated in some form, which the jury may have ultimately found was enough to show he acted as a principal to the murder. Thus, trial counsel made a strategic decision, one he consulted Petitioner about, to include the permissive lesser included offense of aggravated assault that carried a twenty-year sentence. The jury ultimately found Petitioner guilty of that lesser included offense, and consequently Petitioner avoided a life term of

incarceration. Given trial counsel's testimony at the evidentiary hearing, the Court finds no basis to challenge the state court's decision that neither deficient performance nor prejudice occurred under <u>Strickland</u> because of trial counsel's decision to request that instruction. As such, the state court's adjudication of this <u>Strickland</u> claim is neither contrary to nor an unreasonable application of clearly established federal law. And the state court's decision did not rely on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Ground Three is denied.

### d. Ground Four

Petitioner alleges that his trial counsel was ineffective for conceding Petitioner's guilt to the lesser included offense during opening statements. Doc. 4 at 12. He also asserts trial counsel was ineffective for failing to present the viable defense that Petitioner lacked the specific intent to threaten, by word or act, to do violence upon the victim, but instead acted out of duress and fear of retaliation. <u>Id.</u>

Petitioner admits he did not exhaust these claims of ineffective assistance of trial counsel but seeks to overcome this procedural default by relying on <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), and seemingly argues that he can show "cause" to excuse his default because he did not have counsel when he filed his Rule 3.850 motion. Doc. 4 at 12.

Under Martinez, Petitioner must prove more than the general assertion that the trial court did not appoint counsel in the initial-review collateral proceeding. 566 U.S. at 14. Petitioner must "also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id. (citations omitted); see also Lambrix v. Sec'y Fla. Dept. of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). Conversely, his claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." Id. at 16. For the reasons that follow, the Court finds that even if Petitioner shows that his lack of postconviction counsel caused his procedural default, he cannot show that his underlying ineffective assistance of trial counsel claims are substantial.

Petitioner alleges his trial counsel was ineffective for conceding during opening statements that Petitioner was guilty of "a lesser offense" and should have instead pursued a viable defense that Petitioner's actions stemmed from duress or fear of retaliation from his co-defendants Doc. 4 at 12. During opening statements, trial counsel summarized the evidence that would be presented during trial. Resp. Ex. D at 218. He explained that the jury would watch Petitioner's police interview where he admitted to being present and in possession of a firearm at the time of the murder. Id. at 218. But he also argued that the evidence will show that despite that admission, Petitioner did not shoot

34

the victim, nor did he intend to kill anyone. Id. Trial counsel then explained to the jury that Petitioner was facing a first degree murder charge but asserted – "we will ask at the end of this case that you find him guilty of a lesser included offense, something that he is responsible for, something that holds him accountable for what he did and only what he did." Resp. Ex. D at 219.

The evidence presented at trial showed that on the night of the murder, Petitioner willingly traveled with the co-defendants to the victim's home; approached the victim's door, so another co-defendant could confront the victim; and knowingly possessed a firearm during these events. While the evidence may suggest that Petitioner shot the firearm because he feared retaliation from the other co-defendants, nothing suggests any of Petitioner's other actions stemmed from that alleged duress. Considering the evidence, especially Petitioner's own admissions made during his interrogation, trial counsel made a strategic decision to pursue a defense that Petitioner's conduct could not support a first degree murder conviction, but established only a lesser included offense. Contrary to Petitioner's allegations, duress would not have been a viable defense to all of Petitioner's actions that day. Thus, because these claims are insubstantial and lack merit, Petitioner cannot rely on Martinez to excuse the procedural default here. Likewise, Petitioner has not shown that a failure to consider these allegations on the merits will result in a fundamental

miscarriage of justice. Ground Four is denied.

## V.  <u>Motion to Amend his Amended Petition</u>

On October 16, 2023, Petitioner moved to amend his Amended Petition. <u>See</u> Doc. 15. In the Motion, Petitioner alleges that "through diligent research," he has learned that his Amended Petition is not presented correctly and asks that he be allowed to file a second amended petition. <u>Id.</u> at 1. But when seeking leave to amend a habeas petition, a petitioner "should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." <u>See</u> <u>Cita Tr. Co. AG v. Fifth Third Bank</u>, 879 F.3d 1151, 1157 (11th Cir. 2018) (citation and internal quotations omitted). Here, Petitioner has not satisfied this requirement. Thus, his Motion to Amend (Doc. 15) is due to be denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.  The Amended Petition (Doc. 4) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.  Petitioner's Motion to Amend (Doc. 15) is **DENIED**.

3.  The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

4.  If Petitioner appeals this denial, the Court denies a certificate of

appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[9]

**DONE AND ORDERED** at Jacksonville, Florida, this 23rd day of February, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:      Corey Bright, #J10288
        Counsel of record

---

[9] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.